Blank Rome LLP
Lauren B. Wilgus
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 885-5000
Facsimile: (212) 417-9380
E-mail:   lwilgus@blankrome.com

*Attorneys for Defendant Xcoal Energy and Resources*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **CLASSIC MARITIME, INC.,**<br><br>      **PLAINTIFF,**<br><br>v.<br><br>**XCOAL ENERGY AND RESOURCES LLC D/B/A/ XCOAL ENERGY AND RESOURCE,**<br><br>      **DEFENDANTS.** | **Civil Action No.:  1:21-cv-00766-ALC** |

**MOTION TO VACATE WRIT OF ATTACHMENT**

  Pursuant to Rule E(4)(f) of the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Supplemental Admiralty Rules"), Defendant Xcoal Energy and Resources ("Xcoal") generally appears to request that this Court vacate the writ of attachment for Xcoal's funds obtained by Plaintiff Classic Maritime Inc. ("Classic").  Xcoal respectfully submits that the attachment should be vacated for the following because:

- Supplemental Admiralty Rule B only permits attachment of assets when "a defendant is not found within the district…"  However, because Xcoal is registered to do business in New York and maintains an agent for service of process in New York, it is considered as being "found" in the district under controlling Second Circuit precedent.

- Even if Xcoal is considered as not being "found" in the district, the Court should vacate the attachment on equitable grounds – a key consideration with respect to Rule B attachments is securing personal jurisdiction over the defendant, and courts sitting in admiralty are empowered to vacate an order of attachment when it is shown that "the defendant is subject to suit in a convenient adjacent jurisdiction…" Xcoal is headquartered in and formed under the laws of Pennsylvania, and therefore subject to jurisdiction in that equally convenient state for all claims.

- Finally, Classic's claimed damages are contrary to the terms of the applicable charter party, and Classic has further failed to show that it properly mitigated its damages. As such, Classic's damages are too speculative to support a proper order of attachment.

In further support thereof, Xcoal would respectfully show as follows:

### I. BACKGROUND

On January 27, 2021, Classic filed its Verified Complaint (Dkt. 1) which alleged that Xcoal had breached a charter agreement by failing to lift the total tonnage of coal contemplated by certain contracts of affreightment. Based on this loading shortfall, Classic claims that it is entitled to recover $5,089,760.00 from Xcoal, as well as an additional $131,591.62 for alleged outstanding freight charges from prior, successful voyages. After accounting for pre-judgment interest and attorney's fees, Classic claims its damages total $5,941.315.55.

Notably, Classic is not seeking to litigate the underlying validity of its claims before this Court – instead, Classic's claims against Xcoal are to be resolved during the course of New York arbitration, and this present lawsuit was initiated by Classic solely to obtain security for its claims under Supplemental Admiralty Rule B.

Defendant Xcoal learned about this action shortly after it was filed and before the Court had issued the requested writ of attachment. Accordingly, on February 1, 2021, Xcoal submitted a letter motion and related materials requesting a stay prior to any writ of attachment being entered.

Dkt. 8. The Court denied the request for stay and issued a briefing schedule for Defendant's motion to vacate. This motion now follows.

## II. ARGUMENT AND AUTHORITY

### A. Rule B inapplicable because Xcoal is "found" in the district

Rule B provides, in pertinent part, that "[i]f a defendant is not found within the district … a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property—up to the amount sued for—in the hands of garnishees named in the process." Fed. R. Civ. P. Supp. R. B(1)(a). "Although Rule B does not expressly define 'found within the district,' [the Second Circuit] has interpreted it to require 'a two-pronged inquiry: first, whether [Defendants] can be found within the district in terms of jurisdiction, and second, if so, whether [they] can be found for service of process.'" *STX Panocean (UK) Co. v. Glory Wealth Shipping Pte Ltd.*, 560 F.3d 127, 130 (2d Cir. 2009) (quoting *Seawind Compania, S.A. v. Crescent Line, Inc.*, 320 F.2d 580, 582 (2d Cir. 1963). This two-prong inquiry is referred to as the "the *Seawind* Test." *Id*.

In applying this test, the Second Circuit has consistently held that "by merely registering as a domestic corporation with the New York Secretary of State, a defendant is 'found' within the district for the purposes of Rule B attachment." *Shipping Corp. of India v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 63 (2d Cir. 2009) (citing *STX*, 560 F.3d at 133); *see also Carolina Shipping Ltd. v. Renaissance Ins. Grp. Ltd.*, 323 F. App'x 35, 36 (2d Cir. 2009) (rejecting appellant's request to overturn *STX*); *Centauri Shipping Ltd. v. W. Bulk Carriers KS*, 323 F. App'x 36, 37 (2d Cir. 2009) (same); *Transfield ER Cape Ltd. v. Indus. Carriers, Inc.*, 571 F.3d 221 (2d Cir. 2009) (extending *STX* "found" status to alleged alter ego of defendant registered in New York).

Here, Xcoal has provided the Court with uncontroverted evidence that it is both registered to do business in New York, and that it maintains a registered agent for service of process in New York.  See Exhibit A, NYS Entity Information Printout.  Under the clear holding of *STX*, Xcoal is accordingly "found" in the district for the purposes of Rule B, such that no attachment may be issued for its property in the jurisdiction.

Notably, in its filings, Classic actually confirms that its counsel "checked the New York Department of State, Division of Corporations online database ***which showed that the Defendants are registered to do business in New York State as foreign entities***…"  Dkt. 4 at p. 2 (emphasis added).  But Classic nonetheless moved forward with efforts to attach Xcoal's assets, premised on the thin justification that, somehow, the Supreme Court's decision in *Daimler AG v. Bauman*, 517 U.S. 117 (2014) negates the *STX* "found" test.

Classic's position is without support, as Classic's own counsel is well aware.  In addition to having served as counsel of record for one of the parties involved in the *STX* case, Classic's counsel was also involved in a case mere months ago that considered, and rejected, the exact theory Classic now presses.  Specifically, in the case of *Beauty Maritime Inc. v. Sigma Tankers Inc.*, 1:20-cv-4379 (S.D.N.Y. June 12, 2020), Judge Broderick explained as follows:

> Although Plaintiffs admit that Defendant is registered to do business in New York, they argue that the *STX* decision is no longer good law in the wake of the Supreme Court's *Daimler AG v. Bauman*, 571 U.S. 117 (2014) and the Second Circuit's *Chufen Chen v. Dunkin' Brands, Inc*., 954 F.3d 492 (2d Cir. 2020) decisions. (Doc. 10.)  In *Daimler*, the Supreme Court held that the "exercise of general personal jurisdiction over a foreign corporation will not comport with the Fourteenth Amendment's Due Process Clause unless 'that corporation's affiliations with the State are so continuous and systematic as to render it essentially at home in the forum.'"  *Chufen Chen v. Dunkin' Brands, Inc*., 954 F.3d 492, 498 (2d Cir. 2020) (quoting *Daimler AG*, 571 U.S. at 126).  Relying on this holding, *Chufen Chen* held that "a foreign corporation does not consent to general personal jurisdiction in New York by merely registering to do business in the state and designating an in-state agent for service of process."  *Id*. at 499.  Plaintiff suggests that *Chufen Chen*'s rationale extends to determinations of whether a defendant is "found within the

4

district" for purposes of Rule B of the Admiralty Rules.  **However, *STX* did not establish that the Due Process Clause's general personal jurisdiction test was coterminous with Rule B's "found within the district" requirement, and *Chufen Chen* says nothing about admiralty law or Rule B.  Indeed, *STX* counseled that a party's "amenability to suit, rather than [the] party's economic and physical activities in the district at issue, is the touchstone of the first prong of the *Seawind* Test."** *Id*. at 131–32.  **Accordingly, *Daimler*'s general personal jurisdiction test, which specifically focuses on the defendant's economic and physical activities in the forum state, runs counter to the standard established in *STX*.**  In other words, although satisfaction of Daimler's "essentially at home in the forum" test would likely be sufficient to satisfy Rule B's "found within the district" language, I reject Plaintiffs' implied notion that satisfaction of the *Daimler* test is a necessary condition for satisfying Rule B's "found within the district" language.

In any case, because *Chufen Chen* is not an admiralty case, I do not have occasion to deviate from the holding in *STX*.  Cf. *Carolina Shipping Ltd. v. Renaissance Ins. Grp. Ltd*., 323 F. App'x 35, 36 (2d Cir. 2009) ("We are bound by *STX* unless and until its rationale is overruled by the Supreme Court or by this Court *en banc*."); *Centauri Shipping Ltd. v. W. Bulk Carriers KS*, 323 F. App'x 36, 37 (2d Cir. 2009) (same).

*Id*. at slip op. p. 2-3 and n. 1 (emphasis added).[1]

In sum, under controlling Second Circuit precedent in *STX*, Xcoal is "present" in the district for the purposes of Rule B by virtue of being registered to do business in New York, such that Rule B's attachment procedures cannot be properly invoked.  Neither *Daimler* nor *Chufen Chen* involved maritime attachment issues like the case at hand, and they accordingly are irrelevant to the Rule B "present" analysis.  Moreover, Xcoal affirmatively consents to personal jurisdiction, which similarly prevents application of Rule B attachment.  Under the circumstances, Classic cannot show any reason why the order of attachment should not be vacated.

**B.     Alternatively, the attachment should be vacated on equitable grounds**

While the rule of *STX* is clear that Xcoal is present in the district by virtue of its registration in New York, even if the Court were to accept Classic's argument that Xcoal is not "found" for Rule

---

[1]     The *Beauty Maritime* order is available at Dtk. 12-4.

B purposes, Defendant submits that equitable vacatur would still be appropriate. In this regard, the Second Circuit has observed that

> While … the exact scope of a district court's vacatur power is not before us, we believe that a district court may vacate the attachment if the defendant shows at the Rule E hearing that 1) **the defendant is subject to suit in a convenient adjacent jurisdiction**; 2) the plaintiff could obtain *in personam* jurisdiction over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise.

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006), abrogated on other grounds by *Shipping Corp. of India v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58 (2d Cir. 2009) (emphasis added).

Here, it is undisputed that Xcoal is a Pennsylvania company based in Pennsylvania, where it would be subject to jurisdiction for all claims brought against it. And while Pennsylvania does not directly touch the Southern District of New York, the term "adjacent" is not meant to be read so literally:

> [T]he use of the word "adjacent" was not intended to limit a district court's discretion to vacate a maritime attachment on the basis of a defendant's amenability to suit *in personam* in another convenient district only to situations in which that other district literally abutted upon the district in which the attachment was obtained. **Rather, the fundamental considerations are whether the defendant in fact is subject to *in personam* jurisdiction elsewhere and, if so, whether the district in which that is the case is convenient to the plaintiff or attaching party**.

*China Nat. Chartering Corp. v. Pactrans Air & Sea Inc.*, 589 F. Supp. 2d 403, 405–06 (S.D.N.Y. 2008) (emphasis added).

Given that Classic is a foreign entity organized under the laws of the Marshall Islands [see Dkt. 1 at p. 2], there is no reason to believe that Classic bringing suit in one particular U.S. state would be any more convenient, or inconvenient, than another. And, if Classic is ultimately successful in its arbitration action against Xcoal, there is no reason why Classic could not seek to enforce the award against Xcoal in Pennsylvania, where Xcoal has its principal place of business. To the extent that Classic may argue that the physical distance between Pennsylvania and New York is too substantial to

be considered "convenient", Xcoal would simply note that, on January 28, 2021 – one day after filing this suit in New York – Classic also filed a lawsuit for the exact same underlying claims against Xcoal **in the Western District of Texas** (see C.A. No. 1:21-cv-83), a locale much more remote from the Southern District of New York than Pennsylvania. As such, even if this Court were to hold that Xcoal is not "found" in the district despite its registration in New York, vacatur on equitable grounds is still appropriate and within the Court's discretion.

**C.     Classic's damage claims are counter to the underlying contract, and ultimately too speculative to support an almost $6M attachment**

Notwithstanding the fact that Classic cannot meet its threshold burden under Rule B to show that Xcoal is not "found" in the district, Xcoal also addresses the merits of Classic's underlying claim to show that Classic's allegations cannot support the attachment of Xcoal assets, and certainly not for the full amount of $5,941,315.55.

By way of background, Xcoal and Classic are parties to an Americanized Welsh Coal Charter dated 2 December 2019 ("Charter"). The terms and conditions of that Charter specifically provide that freight is not due and owing until the cargo is loaded aboard the vessel:

> Freight payment
> 1. Initial freight payment 95 (ninety five) percent freight is payable on Bill of Lading weight against Owner's invoice 5 (five) working/banking days after loadport agents telegraphically confirm (to Charterers and Owners) that 'clean on board' Bill(s) of lading marked "Freight payable as per Charter Party" have been signed and released to the parties as instructed by Charterers, less address commission and 1.25% brokerage commission to BRS USA.
>
> 2. **Full freight is deemed earned as cargo loaded on board**, discountless whether vessel and/or cargo lost or not lost.
>
>         . . .
>
> 6. Voyage settlement Balance of freight, plus any undisputed deadfreight and/or demurrage if any, less despatch, if any, is to be settled and paid against Owner's invoice thirty (30) days after completion of discharge provided Charterers are in receipt of all the required documentation for closing of accounts by that time, failing which is to be settled as soon as possible thereafter.

7

See Exhibit B at Clause 30.  Thus, despite Classic's assertion that Xcoal breached the charter by failing to supply a number of cargo loads, **no freight is earned until the cargo is loaded on board**, and payment is not due for the first 95% of freight until clean on board bills of lading have been issued, and payment for the remaining 5% of freight is not due until thirty days after Owner's freight invoice is received following discharge.  Consequently, no freight is due and owing under the Charter's payment terms.

Classic relies upon a clause that simply identifies the rate to be paid **if** cargo is loaded aboard the vessel.  *See* Clause 30.A.  To the extent that Classic may be entitled to damages, it has the burden of proving the quantum of those damages, and clearly both the contract terms cited above and its duty to mitigate damages below prevents it from quantifying its damages with any degree of certainty.

Secondly, assuming *arguendo* that Xcoal breached the contract by failing to supply a certain number of cargo loads in 2020, Classic was obligated to mitigate its damages by seeking and obtaining substitute employment for its vessels.  Based upon information and belief, Classic did just that by employing its vessels in other trades.  Xcoal approached Classic multiple times in 2020 to find substitute voyages for the vessels originally intended to transport its cargo from East Coast USA to Korea.  Xcoal asked Classic for time charter equivalent rates to transport its cargo to India, but Classic never responded to Xcoal's overture.  Moreover, each time Xcoal sought a vessel from Classic to carry its cargo to destinations other than Korea, Classic would not make a vessel available until 30 to 45 days later, which was too late for the intended voyages.  Classic's responses indicate that its vessels were already gainfully employed elsewhere.  Xcoal believes that Classic employed its vessels in more lucrative trades, one of which was the iron ore trade to China, whose rates were exceedingly high.  Classic has the burden of proving that it mitigated its damages

and must deduct from its claim all revenue received in doing so.  Evaluating whether and to what extent Classic suffered any damages will require a detailed analysis of Classic's revenue stream in 2020.  Consequently, the legitimate quantum of its claimed damages remains far from certain at this stage and not capable of calculation.

Further, the Charter includes two force-majeure clauses.  One of those clauses provides as follows:

> A. War, whether declared or not, civil war, hostilities, riots, piracy, revolutions, rebellion, acts of sabotage, embargo, blockade, mobilization, acts of any government or governments of any sub-division or agency thereof insurrections, political disturbances, or natural disasters such as violent storms, cyclones, earthquakes, floods, landslides, destruction by lightening, explosions, fires, or destruction of mining machinery and/or any kind of (involved) installations, ice or frost, snow, fog, or bad weather, or boycotts, strikes, lock-outs of any kind, go-slows, occupation of mines and premises, work stoppages whether partial or total of miners or production plant, workmen, lightermen, tugboatmen, or other essentials to the working, carriage, delivery, shipment, discharge or receiving/takeaway of said cargo for which the vessel is stemmed, or acts of Authority whether lawful or unlawful, or **default by Charterer's** Supplier or cargo **Consignee**, or accidents and/or breakdowns at the mines, at or about Supplier/Shippers or Consignees works or berth/anchorage, partial or total stoppage or embargo on the railways, rivers or canals and/or barge lines delivering or receiving or taking away the cargo, or at the (loading/ discharging) port/terminal/dock/berth/ anchorage, or intervention of sanitary, customs, and/or other constituted authorities, **epics, quarantine**, **or any other causes or hindrances beyond the control of the Charterer preventing or delaying** the mining or production, **supplying**, loading or discharging or receiving/takeaway of the **cargo (for which the vessel is stemmed) are excepted**; any time lost at any time by reason of or as a consequence of any or all of the aforementioned causes shall not be computed in the loading or discharging time.
>
> . . .
>
> C. **If because of any event due to Force Majeure under this Charter Party, either party shall be unable to carry out any of its obligation, then the obligation of that party, other than the obligation to pay money, hold harmless, and indemnify, shall be suspended to the extent made necessary by Force Majeure**.  The party affected by Force Majeure shall give prompt notice to the other party of the nature and probable duration at the Force Majeure conditions. Notwithstanding the forgoing, Charterer shall not be responsible for demurrage under any circumstances for any period of time

9

during which Owner's performance is suspended because of Owner's claim of Force Majeure. Such Force Majeure to be valid and substantiated.

See Exhibit B at Clause 50. (Emphasis added).

The other force majeure clause is found in Clause 8 which excepts from performance "[t]he Act of God, the Monarch's king's enemies. [sic] Restraints of princes and rulers, and perils of the sea." As a result of the pandemic, Xcoal's traditional contracting party in Korea, POSCO, declined to purchase cargo loads of Xcoal's product in 2020, which prevented Xcoal from supplying the cargo loads envisioned under the arrangement with Classic. The pandemic and its ensuing fallout were beyond the control of Xcoal and prevented Xcoal's performance. Pursuant to Clause 50.C, Xcoal's performance obligations were suspended for the period of Force Majeure, which continues through the present day. POSCO is still not contracting for the purchase of Xcoal's product as it did before the pandemic.

Lastly, pursuant to the Charter, Classic Maritime is required to litigate its dispute with Xcoal in New York arbitration. Because its actual damages are unknown at this point, Classic should be required to prove up its damages in arbitration. Xcoal should not be subjected to an attachment or garnishment of its property based upon highly speculative damages.

### III. CONCLUSION

Under binding Second Circuit precedent set in *STX Panocean (UK) Co. v. Glory Wealth Shipping Pte Ltd.*, 560 F.3d 127 (2d Cir. 2009), Xcoal and its assets are not subject to Rule B attachment because its is "found" in the district by virtue of being registered to do business in New York and having a registered agent for service of process in New York. Even if that wasn't the case, Xcoal is subject to personal jurisdiction in Pennsylvania, a location that is just as convenient for the foreign-entity Classic to litigate in, such that vacatur is also appropriate on equitable grounds. Finally, the underlying substance of Classic's claims are insufficient (and its alleged

damages too speculative) to justify the attachment of almost $6,000,000 of Xcoal's assets. As recognized by the Second Circuit, "Rule E(4)(f) clearly places the burden on the Classic to show that an attachment was properly ordered and complied with the requirements of Rules B and E." *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 n.5. (2d Cir. 2006) (abrogated on other grounds). Here, Classic cannot meet its burden to sustain the order of attachment. Accordingly, Xcoal respectfully requests that the Court vacate its prior order of attachment, and for all other and further relief as may be just and proper.

Dated: February 4, 2021
      New York, NY

Respectfully submitted,

*/s/ Lauren B. Wilgus*
Lauren B. Wilgus
BLANK ROME LLP
1271 Avenue of the Americas
New York, NY  10020
Ph.: 212-885-5348
Fax: 917-332-3068
Email: lwilgus@blankrome.com

OF COUNSEL

Keith B. Letourneau
State Bar No. 00795893
Fed. I.D. No. 20041
BLANK ROME LLP
717 Texas Avenue, Suite 1400
Houston, TX  77002
Ph.: 713-228-6601
Fax: 713-228-6605
Email: kletourneau@blankrome.com

*Attorneys for Defendant Xcoal Energy and Resources*

145465.06500/125155055v.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of February, 2021, the foregoing was served on all counsel of record in accordance with Rule 5 of the Federal Rules of Civil Procedure, as follows:

James H. Power
F. Robert Denig
Holland & Knight LLP
31 West 52nd Street
New York, NY  10019
James.power@hklaw.com
Robert.denig@hklaw.com
*Counsel for Classic Maritime, Inc.*

                                          */s/ Lauren B. Wilgus*
                                          Lauren B. Wilgus

145465.06500/125155055v.1