# EXHIBIT B





FIRST ORIGINAL

**AMERICANIZED WELSH COAL CHARTER**

APPROVED BY

ASSOCIATION OF SHIP BROKERS & AGENTS (USA), INC.

NEW YORK 1953; AMENDED 1979

*Stamford, CT,*                    *2nd December, 2019*

1.  It is this day mutually agreed, BETWEEN *Classic Maritime Inc. of the Marshall Islands*

2.  *Time Charter* Owner of the ~~Steamship/~~ Motorship *"CLASSIC MARITIME TBN" (See Clause 32)*

3.  ~~of    , built   at   of~~

4.  ~~tons net register, or thereabouts and about  tons total deadweight inclusive of bunkers, classed~~

5.  ~~in length overall beam~~

6.  ~~draft,~~ now trading

7.  and *XCoal Energy and Resources, Latrobe, PA*

8.  1.  That said vessel being tight, staunch and strong and in every way fitted for the voyage, shall, with all possible dis-

9.  patch, sail and proceed to *load one (1) safe berth Baltimore or one (1) safe berth Baltimore + one (1) safe berth Newport News.*

    *All ports, terminals and berth on a named port/berth/terminal basis, and only one port loading.*

    *Any expenses incurred for warping or shifting along or between the loading berth(s) and/or anchorage(s) is to be for Owner's account (except if tugs/linesman/pilots required same for Charterer's account), and time so used is not to count as laytime; however, any expenses incurred for shifting off and back on to, the loading berth(s) and/or anchorage(s), unless required or request by the vessel/Master/Owners, is to be for Shipper's/Charterer's account, and time so used is to count as laytime or time on demurrage, also see Clauses 32, 35, and 43*

10. and there load, always afloat, in the customary manner from the Charterer, in such dock

11. as may be ordered by him, a full and complete cargo of coal *in bulk, which always to be loaded and carried in accordance with the latest IMO recommendations. The coal will meet with IMO guidelines for Bituminous Coal. If two grades, then separation is to be by vessel's natural hold separations, but understood the total cargo intake is not to be restricted by individual cargo grade quantities. Cargo is about 725,000 metric tons 10% more or less in Owner's option coal in bulk loading Baltimore plus about 75,000 metric tons 10% more or less in Owner's option coal in bulk loading Newport News, in 3-4 bottoms.* ~~not exceeding~~

12. ~~tons nor.~~ *(See also Clause 30B3)* ~~tons,~~ quantity at Vessel's option, *(also see Clause 33)* and not exceeding what she can reasonably stow and carry.

13. over and above her tackle, apparel, provisions and furniture; and being so loaded, shall therewith proceed, with all possible dispatch, to *discharge one (1) safe berth Kwangyang or one (1) safe berth Pohang in Charterers' option. Routing in Owners option, but firm intention is Panama Canal for all shipments, and Owners are aware  that "No bunching" on the customer side is a prerequisite for the Charter.*

    *Any expenses incurred for warping or shifting or between the discharge berth(s) and/or anchorage(s) is to be for Owner's account (except if tugs/linesman/pilots required same for Charterers' account), and time so used is not to county as laytime; also see Clause 32, 37 and 43.*

14. or so near thereunto as she can safely get, and there deliver her cargo alongside any wharf and/or vessel and/or craft, as ordered,

15. where she can ~~safely~~ deliver, ~~always afloat,~~ *(See Clauses 37 and 43)* on being paid freight at the rate of *(See Clause 30)*

16. U.S. currency per ton of 1,000 kilos on bill of lading quantity.  The Owner shall furnish, if

17. required, a statutory declaration by the master and other officers that all cargo received on board has been delivered.  The freight

18. is in full of ~~loading, dumping and trimming,~~ and all port charges, pilotages, agency fees and consulages on the vessel.  All wharfage

19. dues on the cargo to be paid by the Charterer.

20. 2.  The FREIGHT is to be paid *as per Clause 30.*

21. 3.  Notice of ~~approximate~~ quantity of cargo required and of vessel's expected date of arrival at port of loading to be given to

22. Charterer or his agents ~~at least~~ *as per Clauses 33 and 36.* ~~days in advance.~~

23. 4.  The Cargo to be loaded into vessel *as per Clause 35.*

24. ~~weather working day(s) of 24 consecutive hours,~~

25. ~~(excluding bunkering time, Sundays, custom house, colliery, legal and/or local holidays, and from noon on Saturday or the day~~

26. ~~previous to any such holiday to 7 a.m. on Monday or the day after any such holiday, unless used in which event only time actually~~

27. ~~used in loading cargo to count)~~ commencing *as per Clause 35G* ~~24 hours~~ after vessel tenders ~~and is ready to load,~~ *(as per Clause 35B) is accepted and ready to load* unless sooner worked, *in which case actual time used to count,* whereupon time

28. is to commence and written notice is given of the vessel's being completely discharged of inward cargo and ballast in all her holds

29. and ready to load, such notice to be given *as per Clause 35B* ~~between business hours of 9 a.m. and 5 p.m., or 9 a.m. and 1 p.m. on Saturdays.  Any time~~

30. ~~lost through riots, strikes, lockouts, or any dispute between masters and men, occasioning a stoppage of pitmen, trimmers or other~~



31. ~~hands connected with the working or delivery of the coal for which the vessel is stemmed, or by reason of accidents to mines or~~

32. ~~machinery, obstructions, embargo or delay on the railway or in the dock; or by reason of fire, floods, frosts, fogs, storms or any cause~~

33. ~~whatsoever beyond the control of the Charterer affecting mining, transportation, delivery and/or loading of the coal, not to be com-~~

34. ~~puted as part of the loading time (unless any cargo be actually loaded during such time).  In the event of any stoppage or stoppages~~

35. ~~arising from any of these causes continuing for the period of six running days from the time of the vessel's being ready to load, this~~

36. ~~Charter shall become null and void; provided, however, that no cargo shall have been shipped on board the vessel previous to such stop-~~

37. ~~page or stoppages.~~  *(See Clause 50)* In case of ~~partial holiday,~~ or partial stoppage of colliery, collieries or railway from any ~~or either of the aforenamed~~

38. causes, *outlined in Clause 50,* the lay-days to be extended proportionately to the diminution of output arising from such partial holiday or stoppage. If

39. longer detained, Charterer to pay *USD C-9 on day of nomination of vessel or sub* U.S. Currency per running day (or pro rata for part thereof)

40. demurrage.  If sooner dispatched, vessel to pay Charterer or his agents *half USD C-9 on day of nomination of vessel or sub* U.S. Currency per day (or pro rata

41. for part thereof) dispatch money for time saved *(See Clause 53).* No deduction of time shall be allowed for stoppage, unless due

42. notice be given *as per Clause 48B.* ~~at the time to the master or Owner.~~

43. 5.  If any dispute or difference should arise under this Charter, same to be referred to three parties in the City of New York, one

44. to be appointed by each of the parties hereto, the third by the two so chose, and their decision, or that of any two of them, shall

45. be final and binding, and this agreement may, for enforcing the same, be made a rule of Court.  Said three parties to be commercial

46. men*; also see Clause 54.*

47. 6.  The cargo to be loaded, dumped and trimmed *as per the custom of the loading facility*  by men appointed by the Charterer at the tariff rate of the port at *their* ~~vessel's~~

48. expense*; also see Clauses 30B and 41.*

49. 7.  ~~The bills of lading shall be prepared in accordance with the dock or railway weight and shall be endorsed by the master,~~

50. ~~Agent or Owner, weight unknown, freight and all conditions as per this Charter, such bills of lading to be signed at the Char-~~

51. ~~terer's or shipper's office within twenty-four hours after the vessel is loaded.  Master shall sign a certificate stating that the~~

52. ~~weight of the cargo loaded is in accordance with railway weight certificate.  Charterer is to hold Owner harmless should any~~

53. ~~shortage occur.~~

54. 8.  The Act of God, the *Monarch's* ~~king's~~ enemies. Restraints of princes and rulers, and perils of the sea excepted.  Also fire, barratry of

55. the master and crew, pirates, collisions, strandings and accidents of navigation, or latent defects in or accidents to, hull and/or

56. machinery and/or boilers always excepted, even when occasioned by the negligence, default or error in judgment of the pilot, master,

57. mariners or other persons employed by the shipowner, or for whose acts he is responsible, not resulting, however, in any case from

58. want of due diligence by the Owner of the ship, or by the ship's husband or manager.  Charterer not answerable for any negligence,

59. default, or error in judgment of trimmers or stevedores employed in loading or discharging the cargo.  The vessel has liberty to call

60. at any ports in any order, to sail without pilots, to tow and assist vessels in distress, and to deviate for the purpose of saving life or

61. property, and to bunker.

62. 9.  The cargo to be discharged by consignee at port of discharge, free of expense and risk to the vessel, ~~at the average rate of~~

63. *as per Clause 37*        ~~tons per day, weather permitting, Sundays and holidays and after noon on Saturdays excepted~~ provided

64. vessel can deliver it at this rate,  If longer detained, consignee to pay vessel demurrage at the rate of *USD C-9 on day of nomination of vessel or sub* U.S. currency

65. per running day (or pro rata for part thereof).  If sooner dispatched, vessel to pay Charterer or his agents *half USD C-9 on day of nomination of vessel or sub* U.S. cur-

66. rency per day (or pro rata for part thereof) dispatch money for *lay* time saved *both ends (See Clause 53)*. Time to commence *as per Clause 37F* twenty-four (24)

67. hours, Sundays and holidays excepted, after vessel is ready to unload and written notice given *and accepted,* ~~whether in berth or not, even if vessel~~

68. ~~is already on demurrage,~~ and the time allowable for discharging to be calculated on the basis of the bill of lading quantity *but also see Clauses 37 and 42.* ~~In case~~

69. ~~of strikes, lockouts, civil commotions, or any other causes or accidents beyond the control of the consignee which prevent or delay~~

70. ~~the discharging, such time is not to count unless the vessel is already on demurrage.~~ *See Clause 38 and 50.*

71. 10.  Notice at port of discharge to be given in writing to consignee's agent ~~on working days between the hours of 9 a.m. and~~

72. ~~5 p.m., and 9 a.m. and noon on Saturdays.~~ *as per Clause 37B*



FIRST ORIGINAL

73.  11. ~~Shifting time from anchorage place to loading or discharging berth is not to count even if vessel is already on demurrage.~~ ***As per Clause 35D and 37C.***

74.  12. ~~Opening and closing of hatches at commencement and completion of loading and discharging shall be for Owner's account~~

75.  ~~and time used is not to count.~~ ***See Clause 39***

76.  13. Lighterage, if any, ***due to Owners failure to comply with his obligations under this Charter Party*** at discharge port to be at the risk and expense of ***Owners*** ~~consignees~~ and time used ***not*** to count as laytime ***or time on demurrage; also see Clause 43***.

77.  14. In case of average, the same to be settled ***in New York*** according to York/Antwerp Rules 1974, ***as amended 1990/thereafter***. Should the vessel put into any port or

78.  ports leaky or with damage, the captain or Owner shall, without delay, inform the Charterer thereof. Captain to telegraph Charterer

79.  in case of putting in anywhere.

80.  15. Vessel not to tender before ~~9 a.m.~~ ***January 2020 (See Clause 34)*** and if vessel be not ready at loading port as ordered

81.  before ~~9 a.m. on~~ ***December 2020 (See Clause 34)***, or if any willful misrepresentation be made respecting the size, position or state of

82.  the vessel, Charterer to have the option of cancelling this Charter, such option to be declared ***latest one hour after*** ~~on~~ notice of readiness being given.

83.  16. Vessel to be consigned to ***Charterers' nominated*** agents at port of loading, and to ***Charterers' nominated*** agents at port

84.  of discharge***; and appointed by Owners.***

85.  17. Overtime is to be for account of party ordering same. However, if ordered by port authorities, same is to be for Charterer's***/Shipper's or Consignee's account.***

86.  ~~account.~~ Officers' and crew overtime expenses to be for Owner's account.

87.  18. ~~Extra insurance, if any, due to vessel's age, flag, classification or ownership shall be for Owner's account.~~ ***See Clause 30C***

88.  19. ~~No cargo is to be loaded in deeptanks or similar places inaccessible to reach by grabs.~~ ***See Clause 32 E/F***

89.  20. ~~Any damage by stevedores shall be settled directly between Owner and stevedores.~~ ***See Clause 32M***

90.  21. Owner shall, at his risk and expense, comply with all applicable rules, regulations and laws relevant to water and/or air

91.  pollution at ports of loading and discharging. In cases where vessel calls at a U.S. port, Owner warrants to have secured and carry

92.  on board the vessel a Certificate of Financial Responsibility as required under U.S. law***; also see Clause 32H & 46***.

93.  22. All bills of lading shall include the following three clauses:

94.  NEW JASON CLAUSE:  In the event of accident, danger, damage or disaster before or after commencement of the voyage,

95.  resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier

96.  is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute

97.  with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be

98.  made or incurred, and shall pay salvage and special charges incurred in respect of the goods.

99.  If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if such salving ship or ships belonged

100.  to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods, and

101.  any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to

102.  the carrier before delivery.

103.  CLAUSE PARAMOUNT:  This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act

104.  of the United States, approved April 16th, 1936, ***or subsequently amended,*** which shall be deemed to be incorporated herein, and nothing herein contained

105.  shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or

106.  liabilities under said Act. If any terms of this bill of lading be repugnant to said Act to any extent, such term shall be void to

107.  that extent but no further.

108.  NEW BOTH-TO-BLAME COLLISION CLAUSE: If the ship comes into collision with another ship as a result of the

109.  negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the

110.  navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all

111.  loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to,

112.  or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the

113.  owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim

114.  against the carrying ship or carrier.

115.  The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other

116.  than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

117.  23.  PROTECTION & INDEMNITY BUNKERING CLAUSE: The vessel in addition to all other liberties shall have liberty as

118.  part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever whether such ports are on or off

119.  the direct and/or customary route or routes to the ports of loading or discharge named in this Charter and there take oil bunkers in

120.  any quantity in the discretion of Owners even to the full capacity of fuel tanks, deep tanks and any other compartment in which

121.  oil can be carried whether such amount is or is not required for the chartered voyage.

122.  24. ~~C.S.U.K. WAR RISKS CLAUSES 1 & 2:  No bills of lading to be signed for any blockaded port and if the port of dis-~~



123. ~~charge be declared blockaded after bills of lading have been signed, or if the port to which the ship has been ordered to discharge~~
124. ~~either on signing bills of lading or thereafter be one to which the ship is or shall be prohibited from going by the government of~~
125. ~~the nation under whose flag the ship sails or by any other government, the Owner shall discharge the cargo at any other port covered~~
126. ~~by this Charter Party as ordered by the Charterers (provided such other port is not a blockaded or prohibited port as above men-~~
127. ~~tioned) and shall be entitled to freight as if the ship had discharged at the port or ports of discharge to which she was originally~~
128. ~~ordered.~~
129. ~~The ship shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destina-~~
130. ~~tion, delivery or otherwise howsoever given by the government of the nation under whose flag the vessel sails or any department~~
131. ~~thereof, or any person acting or purporting to act with the authority of such government or of any department thereof, or by any~~
132. ~~committee or person having, under the terms of the war risks insurance on the ship the right to give such orders or directions and~~
133. ~~if by reason of and in compliance with any such orders or directions anything is done or is not done, the same shall not be deemed~~
134. ~~a deviation, and delivery in accordance with such orders or directions shall be a fulfillment of the contract voyage and the freight~~
135. ~~shall be payable accordingly~~. *Voywar 1993, as attached, to apply.*
136. 25.  Charterer shall have the privilege of transferring part or whole of the Charter Party to others, Charterer guaranteeing to the
137. Owner due fulfillment of this Charter Party.
138. 26.  The Charterer's liability shall cease as soon as the cargo is shipped, and the freight, dead freight and demurrage in loading **and**
     **discharging ports**
139. (if any) are paid, the Owner having a lien on the cargo for freight, demurrage and average.
140. 27.  Penalty for non-performance of this agreement **by either Owners or Charterers**, proved damages, ~~not exceeding~~ **which may or**
     **may not exceed** the estimated amount of freight.
141. 28.  An address commission of **1.25** percent on the gross amount of freight, dead freight and demurrage is due by the vessel
142. and Owner to the Charterer on payment of freight.
143. 29.  A commission of **1.25** percent on the gross amount of freight, dead freight and demurrage is due on payment
144. of freight by the vessel and Owner to **BRS USA LLC which to be deducted from freight payment**.

*Rider Clauses 30-60, both inclusive and Rules for the Shortened Arbitration Procedure, VOYWAR 1993, NYPE Interclub Cargo*
*Claims Agreement are deemed to be fully incorporated in this Charter Party and for a part thereof.*

  *OWNERS:*                                                                    *CHARTERERS:*

"This Charter Party is a computer generated copy of the AMWELSH 79 form printed by authority of the Association of Ship Brokers & Agents (U.S.A), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event that any modification is made to the preprinted text of this document, and is not clearly visible, the provisions of the original ASBA approved document shall apply. ASBA assumes no responsibility for any loss or damage caused as a result of discrepancies between the original ASBA approved document and this document."



FIRST ORIGINAL

ADDITIONAL CLAUSES TO MV "CLASSIC TBN"
CHARTER PARTY DATED 2nd DECEMBER, 2019

**RIDER CLAUSE CONTENT**
30. Freight Rate, Insurance, Freight Payment
31. Owners, Performing Vessel Nomination and Acceptance
32. Performing Vessel Conditions (both Physical and non-Physical) for Loading and Discharging/ Stevedores
33. Cargo Quantity, Narrowing and Final Cargo Declaration
34. Shipment Period/Laycans
35. Loading Terms and Conditions
36. Vessel E.T.A. Notices
37. Discharge Port/Discharging Terms and Conditions
38. Laytime Exceptions
39. Lights/Hatch Opening and Closing/Draft Survey
40. Vessel's Trim
41. Bills of Lading
42. Deadfreight
43. Vessel's Arrival and Sailing Drafts
44. Completion Cargo
45. Funds to Agents/Taxes and/or Dues
46. Pollution
47. P & I Club, Classification, Re-Sale
48. Statement of Facts
49. Damage to Cargo or Terminal/Berth/Personnel
50. Strikes and Other Hindrances
51. Inspections
52. Vessel Crewing/Trading Requirements, Boycott
53. Laytime-Ending/Reversibility
54. Arbitration/Law
55. I.S.M. Clause
56. Business Ethics (Business Practices)
57. Conflict Of Interest
58. Clause Application for Multiple Liftings
59. Confidentiality
60. Moisture Pumping

Attached:
•Rules for the Shortened Arbitration Procedure
• VOYWAR 2013
•NYPE Interclub Cargo Claims Agreement





FIRST ORIGINAL

**Clause 30: Freight Rate/Freight Payment/Insurance**
A. Freight rate
The following rate is in United States of America Dollars (USD) per metric ton on a 'Free In Out Stowed/ Trimmed (FIOST)' basis with trimming as per the custom of the loading facility.

aa. Freight rate:
Baltimore/Korea 1:1, about 125,000/10: USD 29.50
Baltimore + N. News/Korea 2:1 about 135,000/10: USD 28.50
Baltimore/Korea 1:2: USD 30.50
Baltimore + N.News/Korea 2:2: USD 29.35

bb. Deleted.

cc. All other ports
If the cargo is discharged at any port other than Kwangyang or Pohang, then freight is to be paid on a "Time Charter Rate/Equivalent/Open Book" basis as if the vessel discharged at Kwangyang or Pohang (as compared to the actual discharge port) ending the voyage calculation there at the port in question; without taking any positional advantage/disadvantage into account. Owners providing full supporting documentation (voyage estimates).

Freight payment
1. Initial freight payment 95 (ninety five) percent freight is payable on Bill of Lading weight against Owner's invoice 5 (five) working/banking days after loadport agents telegraphically confirm (to Charterers and Owners) that 'clean on board' Bill(s) of lading marked "Freight payable as per Charter Party" have been signed and released to the parties as instructed by Charterers, less address commission and 1.25% brokerage commission to BRS USA.

2. Full freight is deemed earned as cargo loaded on board, discountless whether vessel and/or cargo lost or not lost.

3. Freight for any cargo loaded in excess of the agreed (i.e. Charter Party maximum) quantity, is to be paid at half the agreed freight rate.

4. Initial freight to be paid basis Kwangyang or Pohang discharge with any additional or rebate of freight to be paid/settled on paying balance of freight/voyage settlement.

5. Any cargo insurance premium due to vessel's age may be deducted from the initial freight payment.

6. Voyage settlement Balance of freight, plus any undisputed deadfreight and/or demurrage if any, less despatch, if any, is to be settled and paid against Owner's invoice thirty (30) days after completion of discharge provided Charterers are in receipt of all the required documentation for closing of accounts by that time, failing which is to be settled as soon as possible thereafter.

7. Invoice: All invoices are to be on Owner's letterhead, signed by an authorized signatory and sent as an e-mailed attachment to Charterers via BRS USA with the original mailed directly to Charterers as soon as possible thereafter.

8. Charterers will only pay freight to the Charter Party Owner of record, unless so authorized by Owners to do so on their letterhead and signed by an authorized signatory to do otherwise.

B. Insurance
Any extra cargo insurance due to vessels age (for vessels over 15 years and up to 20 years old on Bills of Lading date), flag, classification, management or ownership to be for Owners' account and may be deducted from initial freight payment; however, same to be substantiated against copies of vouchers with the voyage settlement.



C. Banking Instructions: To be advised


**Clause 31: Owners Performing Vessel Nomination/Acceptance**
A. Owners
All cargo under this Charter Party is to be loaded on and carried by Classic Maritime Inc. of the Marshall Islands, owned, controlled, managed, voyage or time chartered Tonnage to be Nominated (TBN) as per Clause 31B and 32.

B. Vessel nominations, substitution and submission/acceptance
1. Charterers to nominate a 9 day laycan, 30 days prior opening layday.
2. Owners to nominate a vessel or sub, 14 days prior opening layday. Final performing vessel to be declared latest 7 days prior opening layday. Each nominated vessel is subject to shippers and receivers approval, within one full local working day/SHEX
3. For all vessel nominations Owners are to provide full information as required and outlined in 'Charterers Vessel Questionnaire', as forwarded and attached.
4. Submission:
All vessel nominations are to be made in writing (email fax or telex) in New York office hours only between 09:00 hours/17:00 hours on business days (also taken to mean 'working days) Monday through Friday only; no Saturday, Sunday or Holiday nominating/declaring. If the nomination or declaration day falls on a weekend or holiday for any relevant party or country involved in the trade, then the nomination/declaration is due on Friday or the last working day (also taken to mean a business day) prior to said Holiday.
5. Acceptance:
All vessel nominations are subject to Charterer's/Shipper's/Consignee's approval which to be reconfirmed by Charterers within one working day (SHEX) of their receipt of said nomination.

C. Charterers Vessel Questionnaire
Owners are to provide the following information for all vessels nominated (on an `or substitute' basis or as definite performing vessel).
a. full vessel description including:
   1. year built and place of registry
   2. vessel name and any ex name
   3. Vessel's Class and Classification society (IACS member)
   4. flag
   5. deadweight and ssw draft
   6. L.O.A. and beam
   7. number of holds
   8. 'grain' total cubic capacity (in cubic feet) with breakdown by hold
   9. number of hatches and hatch dimensions and type/make of hatch covers and how they open.
   10. if applicable number of cranes and grabs, and placement of cranes
   11. if applicable vessels GA plan
   12. actual de-ballasting rate/capacity (MT/hour)
   13. GRT and NRT
   14. IMO Number
   15. date and place of last special survey
   16. distance from keel to top of hatch cover for each hatch
   17. arrival draft fore and aft in ballast condition (except hold ballast)
   18. distance from fore of hatch 1 to after of hatch 7
   19. distance from waterline to top of hatch coaming of each hatch in ballast condition:
     a. without flooding a hold
     b. flooding/partially flooding a hold
b. approximate cargo quantity required
c. full itinerary (for present cargo) and projected ETA loadport and projected ETA basis Kwangyang or Pohang in Charterers' option.
d. vessel agents last discharge port





FIRST ORIGINAL

e. last 3 cargoes carried with load/discharge port for same
f. last 3 coal cargoes carried with load/discharge ports for same.
g. name of head owner and any (sublet) Owner in between head Owner and charter party Owner; a full 'chain' of ownership must be provided.
h. name of vessel Manager
i. provide written confirmation stating that the vessel, her owners and/or management are not covered by any U.N. Security Council resolution imposing sanctions and/or any U.S.A. rules, regulations or laws imposing sanctions.
j. provide written confirmation stating that the vessel and owner has in effect a Drug and Alcohol Policy
k. advise vessel's H & M value and where insurance for same is placed
l. advise name of Head Owners and Charter Party Owners P and I club
m. confirm the vessel is I.S.M. and I.S.S. (for I.S.P.S. purposes) certified and advise vessels ISS/SMC/DOC number/place of registry, faxing a copy of same
n. copy of an up to date Rightship Questionnaire if required by the cargo Shippers or is customary for the load or discharge port
o. confirm that the vessel has not had any major breakdown(s) or detention(s) or `blacklistings' over the past 12 months.


**Clause 32: Performing Vessel Conditions/Requirements (both Physical and Non-Physical) for Loading and Discharging**
**MV CLASSIC MARITIME TBN**

A. The Performing Vessel is to be a single-deck, self-trimming, gearless, Bulk Carrier or OBO carrier, with bridge/engine aft, classed Highest Lloyds or equivalent, maximum 20 years old (Bill of Lading date), which Owners guarantee is suitable in all respects, whether physical or otherwise (including all required documents and certificates), for loading and discharging at the named (or to be named) load/discharge port(s)/berth(s)/terminal(s)/facilities.

B. If required by cargo Shippers and/or is customary for the loading or discharging port, Owners are to fill out an up to date Rightship Questionnaire and send same with the vessel nomination. Charterers are to advise whether Rightship is required or not when declaring their load port laycan.

C. Owners confirm the Performing Vessel has a good track record, with no major breakdowns, incidents or blacklisting over the last 12 months, and that said vessel is not subject to any sanctions imposed under the resolutions of the United States Security Council or the laws, rules or regulations of the countries in which the load and discharge ports are located which would preclude it from or penalize Charterer for the vessel entering, berthing at, discharging, and leaving ports. Furthermore, it is understood that Charterer is a corporation incorporated under the laws of the state of Pennsylvania, United States of America; consequently, Owner represents and warrants that neither the vessel nor its Owner nor any third party which has Ownership or management interest in the vessel, direct or indirect, are the subject of any laws, rules, regulations or orders of the United States of America under which Charterer could be penalized for, or prohibited from chartering the vessel.

Owners agree to indemnify and hold harmless Charterer from and against any liability, or alleged liability, and all claims, demands, actions and causes of action of whatsoever nature or character, including all cost, expenses and legal fees in defending the same, which may be asserted by a third party or which Charterer may incur to a third party arising out of or as a consequence of Owner's breach or alleged breach of a warranty or representation under this Clause. Any other provision of this Charter to the contrary notwithstanding, Owner's obligation to indemnify and hold Harmless Charterer under this Clause, shall not be excused based upon any condition of Force Majeure.

D. Owners confirm the Performing Vessel has clear self-trimming holds with no centerline beams or bulkheads or obstructions in any hold or hatchway and is guaranteed suitable for being loaded mechanically, for mechanical/spout/or grab trimming, for discharge by mechanical grabs and for the safe working of bulldozers or front-end loaders in the vessel's holds, subject to the vessel's tank top strength.



Owners will be liable for any loss of time incurred by reason of the vessel being unsuitable for the mechanical appliances normally used for loading and discharging bulk carriers. The vessel's hatches and hatch covers are of such a design and construction as not to impede the operation of the ship's loader, or Consignee's discharging equipment.

E. The cargo is to be loaded in lower holds only. No cargo is to be loaded in any area not easily accessible to Consignee's discharging equipment„ but should any cargo be loaded in any such areas, then any extra expenses and/or time incurred at the discharge port to be for Owner's account. Any extra trimming and/or leveling required by Master or Owner (or necessary on account of vessel's construction) at loading shall be performed at Owner's expense and any time lost thereby shall not count as laytime/demurrage; any extra cost and/or time incurred over and above that for normal grab discharge incurred at discharging on account of vessel's construction to be for Owner's account, irrespective of whether the vessel is on demurrage or not.

F. As best can, Owners to properly protect deep tanks, tunnels and any other vulnerable parts within vessel's holds against damage by Stevedore's discharging equipment.

G. Owners warrant the performing vessel has not called at Cuba within at least 180 days prior to arrival in U.S.A. waters.

H. Owners warrants to have secured and carry on board the vessel a US Certificate of Financial Responsibility (Water Pollution) issued by the United States Coast Guard National Pollution Funds Center, Arlington, Virginia 22203-1804. Any time lost due to vessel not having a valid Certificate is not to count as laytime/demurrage and any expenses incurred by Charterers /other parties as a direct/indirect consequence of vessel not having a valid certificate to be fully for Owners account. Also see Clause 46.

I. The expense of vessel's clerk and runner if appointed by vessel/owners at both the loading and discharging ports to be for Owner's account; otherwise costs are for the account of the party ordering same.

J. If the vessel calls at any U.S. port for the purpose of loading or discharging cargo, the vessel's cargo gear, if any, and all other equipment shall, in all respects, comply with the safety and health regulations of longshoring, promulgated by the United States Department of Labor, in pursuance of United States Public Law 85 - 742 and published in title 29, code of regulations, sub part a, section 9.1. et seq.

K. The scantlings of the vessel's tank tops, inner bottom plating, lower wing tank plating stiffeners and shaft tunnel, if any, shall not be less than that recommended by the vessel's classification society for vessels intended to carry coal cargoes.

L. From the date of coming into force of the international code for the security of ships and of port facilities and the relevant amendments to SOLAS (the 'ISPS code) and thereafter during the currency of this Charter Party, the Owners shall warrant that the vessel and 'the company' (as defined in the ISPS code) shall comply with the requirements of the ISPS code.

M. Stevedores and stevedore damage:
1. At all loading and discharging ports, stevedores, although appointed by Charterers Shippers, Consignee(s), Port Authority or their Agents, are under the direction and supervision of the Master who is also responsible for vessel's seaworthiness.
2. Charterers/Shippers, Consignee(s), Port Authority or their Agents are not to be liable for the negligence, error in judgment, acts or omissions, and/or defaults of the stevedores or trimmers; all claims for any such alleged damages or consequences thereof are to be settled directly between Owners and Stevedores, without recourse to Charterers/Shippers, Consignees, Port Authority or their Agents. Any Stevedore damage must be notified in writing by Master directly to stevedores (with copy to Charterers) within 12 hours but always before sailing, except in the case of hidden damage, which to be notified as soon as practical after discovery but latest before sailing. Where necessary, Charterers will endeavor to offer assistance and co-operation to Owners to gain settlement for such damages with stevedores.



3. Time used for repairing damages is not to count as laytime or time on demurrage with Charterers, but any time lost is to be included in any negotiations/settlement stevedore damage resolution with stevedores.

N. No OBO shall be nominated
If the performing vessel is an OBO carrier, the vessel shall arrive at the load port in a gas free condition and shall remain so throughout the duration of the voyage.

O. Time lost through lack of vessel's power, breakdown or inefficiency of equipment or any neglect or fault of the vessel (including failure to have all necessary gas-free/other certificates on board/in order), its Owners, Master and crew or their Agents affecting the loading or discharging operation shall not count as laytime or time on demurrage; any documented stevedore or material handling standby charges resulting therefrom to be for Owner's account.

P. The Performing Vessel is to be presented for loading in such trim and condition as to permit calculation of vessel's light draft. The vessel is to furnish a certified calibration scale for all tanks including fore and aft peak and double-bottom tanks and deep tanks. Plimsoll marks and draft marks on vessel's Port and Starboard side bows and sterns to be clearly cut and marked on the shell plating. Vessel is to furnish a Capacity Plan, Displacement Scale and hydrostatic information and Deadweight Scale and same to be certified by the Master as to their correctness at the time of loading.

Q. Owner shall be responsible for the liable to Charter for all costs, damages, or expenses incurred by Charterer due to vessel's failure to obtain Customs or Immigration clearance, and Owner agrees to indemnify Charterer for such costs, damages or expenses.

R. Owners warrant that the Performing Vessel can de-ballast at the load port in compliance with all rules, regulations, and laws in force at the load and/or discharge port applicable to de-ballasting; at either the load or discharge port any time lost or loss of 'turn' due to vessel taking on ballast, or de-ballasting is not to count as laytime or time on demurrage.

S. The vessel is not to take or release or switch from one tank to another, any ballast, fresh water, or fuel oil while the surveyor is taking draft readings. Master is to keep a full record of any bilge water pumped overboard during the voyage.

T. Any time lost due to prohibition of the vessel from entering the load or discharge port(s) or prohibition of loading or discharging (all) by Governmental Authorities or acts of Authority, whether lawful or unlawful is not to count as laytime or time on demurrage.

U. Cleaning of any normal cargo residue on deck or in the hold as a result of the loading and/or discharging operation is to be Owner's responsibility. Vessel's holds to be left in a payloader 'Blade Clean' condition.

In the event that cargo is left in parts of the holds inaccessible to terminal grabs, Charterers and terminal to be permitted to communicate directly with vessel's crew on how to remove said cargo.

V. Performing Vessel to be fully ISM certified and is to comply with Clause 53.

W. Owners, Master and crew are to comply with all prevailing regulations, requirements (including having relevant certificates onboard). Owners, Master and crew shall also comply with all vessel restrictions, whether physical or otherwise, at both the loading and discharging ports, facilities, and terminals and are to satisfy themselves regarding same.

X. Owners warrant that their policy on the abuse of alcohol and drugs on board the vessel is in accordance with the OCIM (Oil Companies International Marine Forum) guidelines dated Jan 1990 (and any later amendments thereto), and that their policy will remain in effect during the term of this Charter; also see Clause 3IB.



ADDITIONAL CLAUSES TO MV "CLASSIC TBN"
CHARTER PARTY DATED 2nd DECEMBER, 2019

Y. Any time used or lost at either the load or discharge port for vessel Coastguard (or other official entity) security or safety inspections or detentions arising from same is not to count as laytime or time on demurrage; any expenses incurred by Owners or Charterers in this event is to be fully for Owners' account.

Any time, risk or expense incurred by either Charterers or Owners due to Owners non-compliance with any of the above sub-paragraphs (A. through and including Y.) is to be for Owner's account and time is not to count even if the vessel is already on demurrage.

**Clause 33: Cargo Quantity, Narrowing and Final Cargo Quantity Declaration**
A. Cargo Quantities
This Charter Party is for about 725,000 metric tons 10% more or less in Owner's option loading Baltimore plus about 75,000 metric tons 10% more or less in Owner's option loading Newport News in 3-4 bottoms.

B. Letter of Credit (LOC) requirements/impact
Deleted

C. Cargo quantity narrowing and final cargo quantity declaration
Owners are to narrow the cargo quantity to a specific size 10 (ten) percent more or less in Owner's option (MOLOO) and are to advise load port agents of exact/definite cargo quantity required with stowage plans/ breakdown by hold (basis stowage factor as advised by Shippers) on giving vessel 5 day notice ETA basis loadport.

**Clause 34: Shipment Period/Laycan**
January-December 2020

**Clause 35: Load Port and Loading Terms and Conditions**
A. Load port
1. Charterers have the load port options and are to declare the load port as per Clause 1
2. Shifting along or between the load port berth(s) or anchorage(s) during the loading operations is as per Clause 1.

B. Notice of Readiness (N.O.R.) Tendering
1. At all the load ports Master may tender vessel's Notice of Readiness (N.O.R.) in writing (telex, fax cable, or e-mail) to load port agents with copy to Charterers and BRS USA, at any time on any day, Saturdays, Sundays and Holidays included (SSHINC), but never prior to the beginning of the narrowed laycan, but excluding on any 'Super Holidays', after the vessel has arrived to within the port and terminal limits and is secured alongside the loading terminal/berth or anchorage provided the vessel is in Free Pratique, Customs and Immigration cleared and is ready in all other respects to load the cargo.

2. N.O.R. tendering if congestion etc. In the event of congestion or for reasons that Owners/Vessel/Master are not responsible, Master is unable to tender his N.O.R. as agreed, then Master may tender his N.O.R. on arrival at the customary waiting anchorage/berth (as directed by pilots/relevant authority) whether in port (or terminal) or not (WIPON), (provided he is unable to enter to within same), whether in berth or not (WIBON), whether in Free Pratique or not (WIFPON), whether entered Customs/Immigration cleared or not (WECON), and time to count as agreed. If however, immediately on berthing the vessel is found not to be ready in all respects to load the cargo, then N.O.R. is deemed to be null and void, and a new N.O.R. is to be tendered once the vessel is deemed ready in all respects to load, and time is to then count as agreed, irrespective of whether the vessel is on demurrage or not; any time used for gaining Free Pratique or Customs/Immigration clearance is not to count as laytime or time on demurrage.

3. Master is not to tender vessel's N.O.R. prior to last given E.T.A. load port notice.



4. If N.O.R. tendered during an excluded period then N.O.R. to be deemed to have been tendered at 09:00 hours the next working day, or whenever said excluded period (super holiday) ends, whichever the sooner.

5. Hold condition/Survey The vessel is to be in a "gas free" condition (if OBO) and vessels holds to be free of rust scale, clean-swept and dry and suitable in every respect for the carriage of the cargo to Shipper's satisfaction prior to vessel tendering her N.O.R. to load. If the vessel's holds are found not to be to Shipper's (or their surveyors) satisfaction, then N.O.R. will be invalid and will only become valid after vessel is deemed to be clean and ready in all respects to load by Shippers (or their surveyors) provided all other tendering conditions have been met.

C. Shifting In all cases, time used in shifting from the place of tendering and/or waiting to the first/sole loading berth always to be considered part of the voyage and this time or any time spent waiting for tide, pilot, or tugs until the vessel is securely moored at the loading (terminal) berth is not to count as laytime or time on demurrage.

D. Loading Rates: At all the load ports, the cargo shall be loaded and trimmed (as per the custom of the loading facilities) by Suppliers or their Agents free of risk and expense to the vessel at the average daily rate of 25,000 (Baltimore)/35,000 (Newport News) metric tons per weather working day of 24 consecutive hours Sundays and holidays included (SHINC) but excluding any State/Terminal 'Super Holidays', unless used (UU), in which case actual time used to count (ATUTC).

E. Super Holidays
A 'Super Holiday' is defined as a National, State, or local Holiday on which the load port terminal doesn't work. Always understood 'Super Holidays' may run from a specific time on the preceding day (say 19:00 hours) to a specific time or the next working day (say 07:00 hours), rather than say 00:01 hours to 24:00 hours of the holiday, depending on what is customary at the loading terminal.

F. Laytime Commencement
1. Laytime shall commence to count 12 hours after vessel's N.O.R. is tendered and accepted unless sooner commenced (USC) in which case actual time used to count (ATUTC), provided the vessel is ready to receive cargo in every respect.
2. Early or late tendering
   aa. If the vessel tenders N.O.R. prior to the agreed date of laydays commencement Shippers/Charterers are not obliged to berth the vessel or commence loading or for laytime to commence to count until twelve (12) hours after 00:00 hours on the agreed date of laydays commencement (i.e. first day of narrowed laycan) unless sooner commenced in which case actual time used to count, unless otherwise mutually agreed between Charterers and Owners.
   bb. If the vessel tenders N.O.R. after the agreed canceling date and Charterers do not exercise their option to cancel the cargo lifting in question, loading shall be subject to the availability of berth and cargo and laytime will commence to count on commencement of loading.

G. Additional loading conditions:
   aa. In case loading is interrupted or delayed due to insufficient ballast capacity or to any other reason attributable to the vessel, then such time lost is not to count as laytime or time on demurrage; if such interruption continues for more than three (3) hours Shippers or their Agents have the right to order the vessel to vacate the pier/berth and shift from and back to the berth at Owner's time and expense; also See Clause 32Q.
   bb. Any time lost in trimming, while Shipper awaits for Master's instructions, shall not count as laytime or time on demurrage; also see Clauses 32C and 38.
   cc. Vessel shall sail from the loading berth as soon as the loading and subsequent formalities are completed. Unless the relevant authorities authorize extra delays, or unless the vessel is prevented in leaving the berth through fault of the Shipper or Charterers, if the vessel fails to leave within two (2) hours of completion of loading for any reasons attributable to her, any loss of time and/or expenses (direct/indirect) incurred by any party resulting therefrom to be for Owner's account. Refueling can only occur after loading is completed.



H. Otherwise as per Clauses 4, 32, 38, 50, 52, 55 and any other relevant Clauses.

**Clause 36: Vessel E.T.A. Notices**
A. For load port:
On Sailing last discharge port, Master/Owners to advise load port agents vessel's E.T.A. load port, and in addition is to give load port agents 7/5/3/2/1 days and 12 hours' notice of vessel's E.T.A. load port.

B. For discharging port: On sailing load port, Master/Owners to advise discharge port agents of quantity of cargo loaded and vessel's E.T.A. discharge port, and in addition is to give discharging port agents 15/10/7/5/3/2/1 day(s) and 12 (twelve) hours' notice of vessel's E.T.A. discharge port.

C. Notices to other parties: Copies of all load and discharge port notices and cargo quantity declarations given to vessel agents are also to be given to:

XCoal Energy & Resources LLC
Fax: (412) 537 6475
E Mail: xcoal@xcoal.com Attn: Judy Smith

BRS USA
Email: james.falkenstern.p@brsbrokers.com
Fax: 203-487-7070
Attn: James Falkenstern/Philip Syrrist

D. Owners are to keep Charterers closely advised of vessel's positions at all time and are to immediately inform them of any change in vessel's position greater than 24 hours.

**Clause 37: Discharge Port/Discharging Terms and Conditions**
A. Discharge Port
1. Charterers have the discharge port options and are to declare the discharge port as per Clause 1.
2. Shifting along or between the discharge port berth(s) or anchorage(s) during the discharging operations is as per Clause 1.
3. The vessel in addition to fully complying with all discharge port restrictions and regulations/ requirements is to provide whatever mooring ropes are required by the terminal/free of expense to Charterers/Consignee.
4. Vessel's arrival draft is Owner's responsibility and is not to exceed that agreed with the relevant authority at any time during the discharging operations; also see Clause 43.

B. Notice of Readiness N.O.R. Tendering
1. At all the discharging ports, Master may tender his Notice of Readiness (N.O.R.) in writing (telex, fax or cable) to discharge port agents with copy to Charterers and BRS USA, at any time on any day, Saturdays, Sundays and Holidays included (SSHINC), but excluding any 'Super Holidays' after the vessel has arrived to within the port and terminal limits, has been cleared by the local port/relevant authority and is securely moored alongside the discharge berth or anchorage (as directed by the relevant Authority) provided the vessel is in Free Pratique, Customs and Immigration cleared and ready in all other respects to discharge the cargo.
2. N.O.R. tendering if congestion etc. In the event of congestion or for reasons that Owners/Vessel/ Master are not responsible and Master is unable to tender his N.O.R. as agreed, then Master may tender his N.O.R. on arrival at the customary waiting place/anchorage (as directed by pilots/relevant authorities), whether in port/terminal or not (WIPON), (provided he is unable to enter to within the same), whether in berth or at anchorage or not (WIBON), whether in Free Pratique or not (WIFPON), whether Customs/Immigration cleared or not (WECON), and time to count as agreed. If however, immediately on berthing/anchoring the vessel is found not to be ready in all respects to discharge the cargo then N.O.R. is deemed null and void and a new N.O.R. is to be tendered once the vessel is deemed ready in all respects to discharge and time is then to count as agreed, irrespective of whether the vessel is on



demurrage or not; any time used for gaining Free Pratique or Customs/Immigrations clearance is not to count as laytime or time on demurrage.

3. Master is not to tender vessel's N.O.R. prior to last given E.T.A. discharge port notice.

4. If N.O.R. is tendered during an excluded period, then N.O.R. is deemed to be tendered 09:00 hours the next working day, or at commencement of the next official working period after said excluded period ends, whichever the sooner.

C. Shifting

In all cases time used in shifting from the place of tendering/waiting to the first/sole discharging berth/ anchorage is always to be considered part of the voyage and this time or any time waiting for tide, pilot, or tugs until the vessel is securely moored at the discharge terminal berth/anchorage specified by Consignee is not to count as laytime or time on demurrage.

If two port discharge, time from completion of discharge at the first port to acceptance of N.O.R. at the second port is not to count as laytime or as time on demurrage.

D. Discharge rate At all the discharge ports the cargo is to be discharged free of risk and expense to the vessel at the average rate of 50,000 metric tons per weather working day of 24 consecutive hours Sundays and holidays (SHINC) included but excluding 'Super Holidays' on which the discharging terminal doesn't work unless used (UU) in which case actual time used to count (ATUTC).

E. Super Holidays

A 'Super Holiday' is defined as a National, State, or local Holiday on which the discharge port terminal doesn't work. Always understood 'Super Holidays' may run from a specific time on the preceding day (say 19:00 hours) to a specific time or the next working day (say 07:00 hours), rather than say 00:01 hours to 24:00 hours of the holiday, depending on what is customary at the discharging terminal.

F. Laytime commencement at all ports (including second discharge port if used) laytime is to commence to count 12 (twelve) hours after vessel's N.O.R. is tendered and accepted, unless sooner commenced (USC) in which case actual time used to count (ATUTC), provided the vessel is otherwise ready in all respects to discharge.

If the notice time (turn time) expires during an excluded period (`Super Holiday') then laytime to commence at 9:00 hours the next working day or whenever the discharging facility officially re-commences work, whichever the sooner.

G. Vessel shall sail from the discharging berth/anchorage (terminal) as soon as the discharging and subsequent formalities are completed. Unless the relevant authorities authorize extra delays, or unless the vessel is prevented from leaving the berth through fault of the Consignees or Charterers, if the vessel fails to leave the terminal within two (2) hours of completion of discharge for any reasons attributable to her, any loss of time and/or expenses (direct/indirect) incurred by any party resulting therefrom to be for Owner's account.

H. Otherwise as per Clauses 32, 38, 50, 52, 55 and any other relevant Clauses.


**<u>Clause 38: Laytime Exceptions</u>**

At both the load and discharge port any time used or lost during or due to any/all of the following reasons (or operations) shall not count as laytime or time on demurrage, unless specifically specified otherwise:

A. Shifting from the place of tendering or waiting to the 1st load or 1st discharge place (berth/anchorage), NOR shifting from completion first port, to NOR second port, even if on demurrage.

B. Warping or shifting along or between or off and back on to the load or discharge places (berths/ anchorages), is as per Clause 1, unless on demurrage.



C. Vessel taking on ballast or de-ballasting, unless the loading or discharging rate/operations can be maintained as agreed, (or at the respective terminal normal speed during such operations), including any time used for deballasting if the vessel doesn't comply with the required airdraft requirements.

D. Time lost due to prohibition of the vessel from entering the load/discharge port or prohibition of loading/discharging by Governmental Authorities or acts of Authority, whether lawful or unlawful, unless on demurrage.

E. Time used awaiting, or for vessel inspections, Customs clearance, Immigration clearance and/or Free Pratique, unless on demurrage.

F. Delays to the vessel in reaching the loading/discharging place(s) (berths/anchorages) caused by conditions/factors under Owner's/vessel's control, even if on demurrage.

G. Breakdown or inability of the vessel to receive or discharge the cargo at the agreed loading/discharging rate or the respective (load/discharge) terminal (loading/discharging rate) normal speed.

H. Re-positioning of the vessel due to its size/dimensions or obstructions in or on the vessel, which prohibit the free movement of supplier's loading and/or trimming apparatus, or consignee's discharging/takeaway apparatus.

I. Any extra trimming and or leveling of the cargo required by Master or Owner (or necessary on account of vessels construction) over and above that which is customary at the loading facility; any costs incurred for same to also be for Owner's account, even if on demurrage.

J. Master requiring (repair/other) work during the discharging operations and such work interferes with the normal discharging operations, even if on demurrage.

K. Time used for repairing stevedore damage.

L. Opening and last closing of hatches, even if on demurrage.

M. Draft surveys/checks, even if on demurrage.

N. Weather (including sea conditions/swell/fog/wind) conditions delaying or preventing the loading or discharging/takeaway operations, unless on demurrage.

O. 'Super Holidays' unless used in which case actual time used to count, unless on demurrage.

P. Breakdowns or stoppages (of whatever nature) of the loading or discharging/takeaway appliance/equipment which prevents or delays the load/discharge operation, unless on demurrage.

Q. Delays in getting into the load or discharge place (berth/anchorages) after N.O.R. tendered/accepted for any reason over which Charterers have no control, unless on demurrage.

R. An event of Force Majeure including but not limited to strikes, lockout, stoppage or restraint of labour for Master, officers and crew of the vessel or tugboat or pilots and/or any other hindrances or any other reason outside of Charterer's control as outlined in Clause 50.

S. Circumstances or events as outlined in Clauses 32, 39, 50, 52, 55 and any other relevant clauses.


**Clause 39: Lights, Hatch Opening/Closing, and Draft Survey**
A. The vessel is to provide all necessary lights for night work, as on board, free of expense to Charterers. At all ports, provided port regulations permit, vessel to open and close hatch covers as directed by



Shippers or Charterers and/or consignees, or their agents, or Stevedores at Owner's time and expense; vessel is to have hatches opened before commencement of cargo operations at the load and discharge port, failing which any time lost is not to count as laytime or time on demurrage.

B. In addition, the Master shall, at Owner's expense cover the hatch of each hold as soon as the loading into it has finished and/or cover all hatches when the loading or discharging has finished for the day. When raining or snowing Master shall cover all hatches not actually being loaded or discharged.

C. Time used for taking draft surveys/checks is not to count as laytime or time on demurrage.

### Clause 40: Vessel's Trim
Vessel to be left in seaworthy trim to Master's and Port Authorities' satisfaction for transit between the load and discharge ports and shifting between load or discharge ports berths or anchorages.

### Clause 41: Bills of Lading
A. Bills of Lading (Charterer's form) shall be prepared in accordance with draft survey weight certificates or certified belt scale weight certificate (custom and requirement of the loading facility to determine) issued by independent surveyor contracted by the Shipper or Charterers and shall be signed by the Master, or Charterer's agents on his behalf if so requested by Charterers) endorsed "Freight payable as per Charter Party", with relevant Charter Party date (on face only), date of completion of loading and destination as prepared and presented by Shippers and/or Charterer's agents in line with terms and conditions of this Charter Party. Such Bills of Lading to be signed promptly and released as reasonably soon as possible after the vessel has completed loading.

B. In the event of Bills of Lading not being available in time at the discharge port, Owners are, if requested by Charterers, to release the entire cargo without presentation of the original Bills of Lading. Charterers hereby indemnify Owners against any consequences whatsoever that may arise due to their releasing the cargo without production of the original Bills of Lading against Owner's P & I Club standard Letter of Indemnity (L.O.I.) which to be issued and signed by Charterers only (i.e. no bank guarantee or equivalent security is required from Charterers) prior to vessel's commencement of discharge. Prior to vessel's arrival at the discharge port L.O.I. to be faxed to the Owners for their approval and original (if requested), to be mailed to Owners as soon as possible. And Charterers endeavor to obtain, where possible, L.O.I. to be countersigned by receivers as named in the Bills of Lading.

### Clause 42: Deadfreight
In the event of deadfreight being due, laytime shall be calculated on the basis of tonnage for which the freight is paid and not the Bill of Lading quantity.

### Clause 43: Vessel's Arrival and Sailing Drafts
A. Vessel to load to a safe draft as recommended by the Pilots or the relevant Authority.

B. Actual vessel arrival and sailing drafts at both the load and discharge ports/terminals is to be Owner's responsibility and is to be co-coordinated by the Owners with the relevant Port/Terminal/Pilot Association/Authorities. Since the discharge port under each lifting will not be declared until well after loading, it is understood and agreed that the Owners will load vessel(s) to maximum loadport draft. If there is any draft limitations at the discharge ports/berths nominated, then any lighterage to be done at Charterers time/risk/expense; and the Charterers are to provide sufficient fenders acceptable to the Master of the vessel. Any extra insurance applicable to be for Charterer's account.

### Clause 44: Completion Cargo
Owner is not allowed to load completion cargo, but also see Clause 48B.



**Clause 45: Funds to Agents/Taxes and/or Dues**
A. All port expenses (vessel port disbursements) are to be for Owner's account. Prior to vessel's arrival at the loading and discharging port Owners to provide agents with sufficient funds to cover Port Disbursements and any other required/normal expenses, failing which the Charterers are not to be responsible for any delays to the vessel caused by Owners failure to place agents in funds.

B. Any taxes and/or dues on cargo to be for Shipper's/Charterers'/Consignee's account; any taxes and/or dues on vessel, and/or freight however assessed, to be for Owner's account.

**Clause 46: Pollution**
Further to Clauses 21 and 32G Owner agrees to indemnify Charterer and its Agents against any liability which may be imposed on them or which may occur under any statute regarding liability for pollution of water or air by performing vessel. This Clause is not applicable if due to cargo air or water pollution and/or dust and/or spillage caused by Charterers, Shippers or Consignees or their servants during the loading or discharging operations.

**Clause 47: P & I, Classification, Re-Sale**
During the term of this Charter Party the Owners warrant that the performing vessel:

A. Is entered with a P & I Club, (as advised) is duly classified (as advised) and will remain in class and covered by P & I Club insurance; P & I Club insurance cover is to include claims for cargo damage, cargo shortage, damage to terminal or berth war risk, pollution etc.

B. Hull and Machinery Insurance shall be fully maintained.

C. Shall not change ownership and/or class without Charterer's prior consent.

**Clause 48: Statement of Facts**
A. Owner agrees that Master is to sign Statement of Facts (S.O.F.) or timesheets submitted to him by the agent, even if matters are in dispute, in which case the Master is to put his remarks on the document or make his reserve otherwise. At the load port and prior to sailing, the Master shall certify in writing that the stowage has been performed safely to his satisfaction provided this is the case.
B. No deduction of (excepted) laytime shall be allowed, unless due notice be given to the Master or Owners, by Charterers, Suppliers or Shippers, or Consignee or their Agents or unless same is evidenced in the Statement of Facts (S.O.F.)

**Clause 49: Damage to Cargo or Load or Discharge Port Terminal or Berth or Personnel**
A. Cargo claims to be settled in accordance with the NYPE Interclub Agreement's latest issue, as attached.

B. In the event of damage to either the loading berth or terminal or cargo supply or loading equipment (say barges/floating cranes) or the discharging berth or terminal or cargo takeaway equipment, or injury to personnel during the loading or discharging operations through reasons directly attributable to negligent action or omissions of Owners or vessel or Master or crew, then Owners shall be fully responsible for any proven direct costs and losses resulting therefrom and any time so lost in loading or discharging is not to count as laytime or time on demurrage.

C. Also see Clause 32M.



**Clause 50: Force Majeure/Exceptions - Strikes and Other Hindrances**
A. War, whether declared or not, civil war, hostilities, riots, piracy, revolutions, rebellion, acts of sabotage, embargo, blockade, mobilization, acts of any government or governments of any sub-division or agency thereof insurrections, political disturbances, or natural disasters such as violent storms, cyclones, earthquakes, floods, landslides, destruction by lightening, explosions, fires, or destruction of mining machinery and/or any kind of (involved) installations, ice or frost, snow, fog, or bad weather, or boycotts, strikes, lock-outs of any kind, go-slows, occupation of mines and premises, work stoppages whether partial or total of miners or production plant, workmen, lightermen, tugboatmen, or other essentials to the working, carriage, delivery, shipment, discharge or receiving/takeaway of said cargo for which the vessel is stemmed, or acts of Authority whether lawful or unlawful, or default by Charterer's Supplier or cargo Consignee, or accidents and/or breakdowns at the mines, at or about Supplier/Shippers or Consignees works or berth/anchorage, partial or total stoppage or embargo on the railways, rivers or canals and/or barge lines delivering or receiving or taking away the cargo, or at the (loading/ discharging) port/terminal/dock/berth/ anchorage, or intervention of sanitary, customs, and/or other constituted authorities, epics, quarantine, or any other causes or hindrances beyond the control of the Charterer preventing or delaying the mining or production, supplying, loading or discharging or receiving/takeaway of the cargo (for which the vessel is stemmed) are excepted; any time lost at any time by reason of or as a consequence of any or all of the aforementioned causes shall not be computed in the loading or discharging time.

B. An occurrence of any of the above exceeding a period of 6 running days directly or indirectly affecting the loading of cargo under this Charter Party will entitle but not obligate the Charterer to cancel the cargo lifting in question without liability for any loss or damage (to either party), provided no cargo has been loaded prior to or during such time. In the event of partial cargo being loaded the vessel is to proceed with same, and subject to Charterers approval, has the right to complete with other cargo en route to the discharge port which always to remain the first port of discharge.

C. If because of any event due to Force Majeure under this Charter Party, either party shall be unable to carry out any of its obligation, then the obligation of that party, other than the obligation to pay money, hold harmless, and indemnify, shall be suspended to the extent made necessary by Force Majeure. The party affected by Force Majeure shall give prompt notice to the other party of the nature and probable duration at the Force Majeure conditions. Notwithstanding the forgoing, Charterer shall not be responsible for demurrage under any circumstances for any period of time during which Owner's performance is suspended because of Owner's claim of Force Majeure. Such Force Majeure to be valid and substantiated.

In this Charter Party the term 'Force Majeure' includes but is not limited to any one or more of the occurrences outlined in Clause 50A. D. A party whose performance is attended by Force Majeure shall use its best efforts to eliminate the Force Majeure situation insofar as possible with a minimum of delay, and shall promptly give notice to other party as to changes in the anticipated duration thereof as well upon cessation of the Force Majeure situation. Neither party shall be required to settle or avoid strikes, lockouts, boycotts, work stoppages, restraints of labor or other labor troubles by acceding to any demands when at the sole discretion of that party if would be inadvisable to do so.

**Clause 51: Inspections**
Owner and master authorize Charterer/Shippers/Consignee or their representatives to inspect the cargo on board during loading and prior to and during discharge operations, and any person appointed by said entities will have free access to the vessel for this purpose, if allowed by shore regulations.

**Clause 52: Vessel Crewing/Trading Requirements, Boycotts**
A. The Owners of the vessel guarantee that the minimum terms and conditions of employment of the vessel's crew are now and will at all times during the currency of this Charter Party, be covered by an ITF agreement or, if same is not required (by the relevant authorities), by an agreement acceptable to the relevant authorities within/at the countries, port(s) and places specified in this Charter Party.



Owners further warrant that the vessel (and her flag) is eligible for trading to the countries, port(s) and places specified for the voyage and at all times shall have on board all certificates, records and other documents required by the relevant Authorities for such trading, failing which Owner's to be held responsible for any and all consequences resulting from same; any expenses so incurred are to be for Owner's account and any time lost is not to count as laytime or time on demurrage.

B. In the event of any loss of time or boycott of the vessel by, or any labor problems with, Shore Labor, Seaman's Union, Tugboats, Pilots or Local Authorities arising by reason of vessel's flag, nationality or registry, her ownership (direct or indirect), management or agents, the nationality of any member of her crew or the prior trading of the vessel or the trading of any other vessel under the same ownership and/or control, then Owners to be held responsible for any all consequences resulting from such actions. Any costs, damages or expenses incurred to be for Owner's account and any time lost is not to count as laytime or time on demurrage and owner agrees to indemnify Charterer any for such costs, damages or expenses.

**Clause 53: Laytime - Ending/Reversibility**
A. Laytime at the load port is to end on completion of loading (and cargo trimming operations) and withdrawal of any trimming apparatus. Laytime at the discharge port is to end on completion of the discharging operations and withdrawal of any equipment used for final "trimming-out" of vessels holds.

B. Laytime at/between the load and discharge port is non-reversible; however, in the event of two point discharge laytime between the discharge ports is in Charterer's option, reversible.

**Clause 54: Arbitration Law**
Further to Clause 5, notwithstanding anything contained herein to the contrary, should the sum claimed by each party not exceed U.S. $75,000.00, the dispute is to be governed by the "Shortened Arbitration Procedure" of the Society of Maritime Arbitrators, Inc. (S.M.A.) of New York, as defined by the Society's current Rules for such procedure, copy of which is attached hereto. U.S. Maritime Law will govern any dispute under this Charter Party, and to the extent that such body of law needs to be supplemented, by the laws of the state of New York.

**Clause 55: I.S.M. Clause**
Owners warrant that at all times throughout the voyage, vessel shall comply as required by the states of the ports at which vessels calls with I.S.M. Code of I.M.O. (International Safety Management Code of International Maritime Organization) and shall carry all necessary valid certificates and copies of documentation relating thereto, including but not limited to valid Safety Management Certificate or where applicable valid interim safety management certificate for the vessel, copy of valid Document of Compliance of company responsible for vessel's safety management, copy of vessel's safety management manual, and vessel's internal audit records, as required by the code, and any delay and/or extra expenses incurred due to the vessel not complying as required with the I.S.M. Code to be for Owner's account. Should the vessel having arrived at loadport not be able to commence loading as ordered before the cancelling date and time referred to in Clause 15 of this Charter Party as a result of failure to comply with the port/state's requirements under the I.S.M. Code, Charterers to have the option exercisable at any time before vessel becomes ready to commence loading of cancelling the voyage, and to have the further option to charter in another vessel at prevailing market rate to perform the voyage with Owners compensating Charterers for any resulting increase in Charterer's costs.

**Clause 56: Business Ethics (Business Practices)**
A. COMPLIANCE WITH THE LAW. Except to the extent compliance might be penalized under the laws of the United States of America, Owner agrees to comply with all laws and lawful regulations applicable to any activities carried out in the name of or on behalf of Charterer under the provision of this contract and any amendments to it.



B. ACCURACY OF RECORDS. Owner agrees that all financial settlements, billings, and reports rendered to Charterer will reflect properly the facts about all the activities and transactions handled for the account of Charterer, which data may be relied upon as being complete and accurate in further recordings and reports made by Owner for any purpose.

C. AGREEMENT TO GIVE ADVICE. Owners agrees to notify Charterer promptly upon discovery of any instance where Owner fails to comply with the provisions (A) above, or where Charterer has reason to believe data coverer by (B) above is no longer accurate and complete.

**Clause 57: Conflict of Interest (Business Standards)**
Each party, in performing its obligations under this agreement, shall establish and maintain appropriate business standards, procedures, and controls, including those necessary to avoid real or apparent impropriety or adverse impact on the interest of the other party. Each party shall review with reasonable frequency during the term of this agreement, such business standards and procedures including without limitation those related to the activities of its employees and agents in their relations with the other parties employees, agents, and representatives, and other third parties.

**Clause 58: Clause Application/Interpretation for Multiple Liftings**
While many clauses in this Charter Party are written for a single voyage, it is understood that all clauses are applicable for all liftings under this Charter Party. It is also understood that (as multiple liftings) this Charter Party may also be called a Contract of Affreightment (COA).

**Clause 59: Confidentiality**
This fixture is to be kept strictly "PRIVATE AND CONFIDENTIAL". This fixture is not to be reported – all details to remain P&C.

**Clause 60: Demurrage Charter Party Reflection**
Charter Party to reflect throughout, "Once on demurrage, always on demurrage".

**Clause 60: Moisture Pumping**
The Vessel/Master is not to send Bilge report to Agent or any other outside party.

**Rules for Shortened Arbitration Procedure**
A. The maximum amount claimed by each party shall not exceed U.S. $75,000. This sum shall not include interest on the amount claimed, costs of the arbitration, and legal expenses, if any.

B. The parties shall attempt to agree upon a sole arbitrator, but if unable to do so within fifteen (15) days from the receipt of the demand for arbitration, a panel shall be formed pursuant to the arbitration clause of the governing charter party, contract or agreement, and proceed in accordance with these Rules. Such party appointed arbitrators shall agree upon the third arbitrator within ten (10) days of acceptance of their appointment, failing which either of the appointed arbitrators shall apply to the S.M.A. for designation of the third arbitrator.

C. Failing timely appointment of an arbitrator by the defendant with fifteen (15) days of notice of appointment of claimant's arbitrator, the arbitrator appointed by claimant shall become and act as sole arbitrator.

D. Within fifteen (15) days from date of acceptance of appointment, the sole arbitrator or panel shall establish a schedule for the written presentation of each party's claims and the documents upon which the parties rely.



E. If requested by a party, a single hearing may be convened for the purpose of orally supplementing that party's written presentation and/or responding to the position of its opponent. No witnesses shall be heard, and unless agreed and arranged by the parties, no written transcript of the hearing shall be maintained. Under exceptional circumstances, each party may, at the sole discretion of the sole arbitrator or panel, be permitted a single postponement, which shall not exceed ten (10) days.

F. Within fifteen (15) days from conclusion of the evidential phase of the proceeding, either party may submit one written summary of its position, following which the sole arbitrator or panel shall declare the proceeding closed.

G. The fee of each participating arbitrator shall not exceed U.S. $1,000.00 and may, at the discretion of the sole arbitrator or panel, be assessed against either party or jointly and severally among the parties to the dispute.

H. The award shall be issued within thirty (30) days from date of closing of the proceeding. It shall be composed as concisely as practicable.

I. In all other respects, including the enforcement provision, the terms of the arbitration clause of the governing charter party or agreement shall apply.
The Society of Maritime Arbitrators, Inc. of New York c Rev. June


**VOYWAR 1993**
(1) For the purpose of this Clause, the words:
(a) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and
(b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgment of the Master and/or the Owners, may be dangerous or are likely to be or become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2) If at any time before the Vessel commences loading, it appears that, in the reasonable judgment of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers canceling this Contract of Carriage, or may refuse to perform such part of it as may expose, or is likely to exposed, the Vessel her cargo, crew or other persons on board the Vessel to War Risks, provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers, the Vessel , her cargo, crew, or other persons on board the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of such requirement.

(3) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgment of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may



discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfillment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as thought the cargo had been carried to the discharging port and if the extra distance 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

(4) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may, be or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance of the normal and customary route.

(5) The Vessel shall have liberty:
(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so required, or any body or group acting with the power to compel compliance with their orders or directions;
(b) to comply with the orders, directions, recommendations of any war risks underwriters who have the authority to give the same under the terms if the war risks insurance;
(c) to comply with the terms of any resolution of the Security Counsel of the United Nations, any directives of the European Community, the effective orders of any other Super national body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;
(d) to discharge at any other port or part thereof, which may render the Vessel liable to confiscation as a contraband carrier;
(e) to call at other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to interment, imprisonment or other sanctions;
(f) Where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.
(g) If noncompliance with any of the provisions of sub-clauses 2) to 5) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfillment of the Contract of Carriage.


**<u>NYPE Interclub Cargo Claims Agreement</u>**
This Agreement is made on 1 September 1996 between the P&I Clubs being members of The International Group of P&I Associations (hereafter referred to as "the Clubs").

This Agreement replaces the InterClub Agreement 1984 in respect of all charterparties specified in Clause (1) hereof and shall continue in force until varied or terminated. Any variation to be effective must be approved in writing by all the Clubs but it is open to any Club to withdraw from the Agreement on giving to all the other Clubs not less than three months' written notice thereof, such withdrawal to take effect at the expiration of that period. After the expiry of such notice, the Agreement shall nevertheless continue as between all the Clubs, other than the Club giving such notice who shall remain bound by and be entitled to the benefit of this Agreement in respect of all cargo claims arising out of charterparties commenced prior to the expiration of such notice.

The Clubs will recommend to their Members without qualification that their Members adopt this Agreement for the purpose of apportioning liability for claims in respect of cargo which arise under, out of



or in connection with all charterparties on the New York Produce Exchange Form 1946 or 1993 or Asbatime Form 1981 (or any subsequent amendment of such forms), whether or not this Agreement has been incorporated into such charterparties.

Scope of application
(1) This Agreement applies to any charterparty which is entered into after the date hereof on the New York Produce Exchange Form 1946 or 1993 or Asbatime Form 1981 (or any subsequent amendment of such forms).

(2) The terms of this Agreement shall apply notwithstanding anything to the contrary in any other provision of the charterparty; in particular the provisions of Clause (6) (time bar) shall apply notwithstanding any provision of the charterparty or rule of law to the contrary.

(3) For the purposes of this Agreement, cargo claim(s) mean claims for loss, damage, shortage (including slackage, ullage or pilferage), overcarriage of or delay to cargo including customs dues or fines in respect of such loss, damage, shortage, overcarriage or delay and include:
(a) any legal costs claimed by the original person making any such claim;
(b) any interest claimed by the original person making any such claim;
(c) all legal, Club correspondents' and experts' costs reasonably incurred in the defence of or in the settlement of the claim made by the original person, but shall not include any costs of whatsoever nature incurred in making a claim under this Agreement or in seeking an indemnity under the charterparty.

(4) Apportionment under this Agreement shall only be applied to cargo claims where:
(a) the claim was made under a contract of carriage, whatever its form,
(i) which was authorised under the charterparty; or
(ii) which would have been authorised under the charterparty but for the inclusion in that contract of carriage of Through Transport or Combined Transport provisions, provided that
(iii) in the case of contracts of carriage containing Through Transport or Combined Transport provisions (whether falling within (i) or (ii) above) the loss, damage, shortage, overcarriage or delay occurred after commencement of the loading of the cargo onto the chartered vessel and prior to completion of its discharge from that vessel (the burden of proof being on the Charterer to establish that the loss, damage, shortage, overcarriage or delay did or did not so occur); and
(iv) the contract of carriage (or that part of the transit that comprised carriage on the chartered vessel) incorporated terms no less favourable to the carrier than the Hague or Hague Visby Rules, or, when compulsorily applicable by operation of law to the contract of carriage, the Hamburg Rules or any national law giving effect thereto; and
(b) the cargo responsibility clauses in the charterparty have not been materially amended. A material amendment is one which makes the liability, as between owners and charterers, for cargo claims clear. In particular, it is agreed solely for the purposes of this Agreement:
(i) that the addition of the words "and responsibility" in Clause 8 of the New York Produce Exchange Form 1946 or 1993 or Clause 8 of the Asbatime Form 1981, or any similar amendment of the charterparty making the Master responsible for cargo handling, is not a material amendment; and
(ii) that if the words "cargo claims" are added to the second sentence of Clause 26 of the New York Produce Exchange Form 1946 or 1993 or Clause 25 of the Asbatime Form 1981, apportionment under this Agreement shall not be applied under any circumstances even if the charterparty is made subject to the terms of this Agreement; and
(c) the claim has been properly settled or compromised and paid.

(5) This Agreement applies regardless of legal forum or place of arbitration specified in the charterparty and regardless of any incorporation of the Hague, Hague Visby Rules or Hamburg Rules therein.

Time Bar
(6) Recovery under this Agreement by an Owner or Charterer shall be deemed to be waived and absolutely barred unless written notification of the cargo claim has been given to the other party to the charterparty within 24 months of the date of delivery of the cargo or the date the cargo should have been delivered, save that, where the Hamburg Rules or any national legislation giving effect thereto are



compulsorily applicable by operation of law to the contract of carriage or to that part of the transit that comprised carriage on the chartered vessel, the period shall be 36 months. Such notification shall if possible include details of the contract of carriage, the nature of the claim and the amount claimed.

The apportionment
(7) The amount of any cargo claim to be apportioned under this Agreement shall be the amount in fact borne by the party to the charterparty seeking apportionment, regardless of whether that claim may be or has been apportioned by application of this Agreement to another charterparty.

(8) Cargo claims shall be apportioned as follows:
(a) Claims in fact arising out of unseaworthiness and/or error or fault in navigation or management of the vessel:
100% Owners save where the Owner proves that the unseaworthiness was caused by the loading, stowage, lashing, discharge or other handling of the cargo, in which case the claim shall be apportioned under sub-clause (b).
(b) Claims in fact arising out of the loading, stowage, lashing, discharge, storage or other handling of cargo:
100% Charterers unless the words "and responsibility" are added in Clause 8 or there is a similar amendment making the Master responsible for cargo handling in which case:
50% Charterers
50% Owners
save where the Charterer proves that the failure properly to load, stow, lash, discharge or handle the cargo was caused by the unseaworthiness of the vessel in which case:
100% Owners
(c) Subject to (a) and (b) above, claims for shortage or overcarriage:
50% Charterers
50% Owners
unless there is clear and irrefutable evidence that the claim arose out of pilferage or act or neglect by one or the other (including their servants or subcontractors) in which case that party shall then bear 100% of the claim.
(d) All other cargo claims whatsoever (including claims for delay to cargo):
50% Charterers
50% Owners
unless there is clear and irrefutable evidence that the claim arose out of the act or neglect of the one or the other (including their servants or subcontractors) in which case that party shall then bear 100% of the claim.
Governing Law
(9) This Agreement shall be subject to English Law and Jurisdiction, unless it is incorporated into the charterparty (or the settlement of claims in respect of cargo under the charterparty is made subject to this Agreement), in which case it shall be subject to the law and jurisdiction provisions governing the charterparty.


**OWNERS:**                                        **CHARTERERS:**